Good afternoon, your honors. May it please the court. My name is Jennifer Bongean, and I represent the plaintiff's appellant in this matter, Paul Stiolino. As this court is surely aware, this appeal involves one of the most sensational criminal cases in the history of human rights. But most fundamentally, this case asks whether personal and political agendas trump facts and truth. This case could not be more timely. Mr. Stiolino respectfully requests that this court vacate the circuit court's order dismissing his defamation, false rights, intentional searching of emotional distress, and conspiracy claims pursuant to section 2-619. Let's be clear. The case isn't about the underlying case. The case is a defamation case, correct? That's correct, your honor. So let's proceed. It is true that it's not about the underlying case, but whether or not, for instance, the defendants allege that they're entitled to the fair use, qualified immunity, those types of things do get into the underlying case. The case was dismissed on a statute of limitations. Let's just focus on that, because that's what the case is about. Understood. Okay. So in February of 1999, Mr. Stiolino secured the highly publicized, video-recorded confession of all three silence to the 1982 murder of Jerry Hillard and Marilyn Greene. And 17 years earlier, Anthony Porter had been arrested, convicted, sentenced to death for those same murders. Mr. Stiolino's colleague, his former Northwestern University professor, David Protest, and his students had developed compelling evidence after investigating the murders, and that, along with the confession of Simon, ultimately led Cook County State's attorney, Richard Devine, to vacate Porter's convictions, and ultimately to indict all three Simons. All three Simons eventually did plead guilty, actually shortly thereafter. He pled guilty to a negotiated, in a negotiated plea agreement to reduce charges, and at that plea hearing, he apologized in open court to the victim's mother, said he didn't intend to hurt her, and the death was an accident. Simon confessed at least eight more times than we know of. He did so in multiple correspondences with attorneys, other attorneys, and a heartfelt apology to Anthony Porter. He did so even on TV, in a news interview with a local news affiliate. But, after the fanfare disappeared a little bit, and Mr. Simon decided that he did not actually want to serve out his time in the Illinois Department of Corrections, and he reached out to an attorney by the name of David Thomas. And David Thomas was a professor at Chicago Penn College of Law, and he was looking for representation to help him vacate his guilty plea. He was not happy with the fact that he didn't do the shooting. He said, I did it, but I did it in self-defense, and Marilyn Greene was accidentally shot. Now, Thomas didn't take the case, but Simon did find allies, and he found allies in the defendants, and specifically Defendant Delorto, who was an investigator, who worked for attorneys Defendant Echol and Soto, and shared a goal of undermining the Porter exoneration, and in turn, undermining the work of Northwestern, David Protest, and Paul Schoenberg. Now, their efforts of undermining the Porter exoneration and exonerating Mr. Simon were largely unsuccessful. Echol and Soto began representing Mr. Simon in 2002, and for about 10 years, the case went nowhere. Mr. Simon's post-conviction petitions were dismissed. His successor petition was dismissed. Those dismissals were affirmed by this court, and in fact, there's never been an evidentiary hearing or any type of plenary hearing where there was a factual inquiry into his allegations, and those were allegations in his post-conviction petition. And after essentially getting nowhere in the case, they came up with an alternative set of facts that they would advance in the media, and they actually consulted with a consultant who was credited for coming up with the Swift Vote campaign, that is, allegedly was responsible for taking John Kerry's presidential bid, and they also teamed up with other members who are defendants in this case. That is, William Crawford, who was a Chicago writer, a retired writer, and Martin Creed, a Chicago police officer who maintained a blog that was very critical of the so-called wrongful conviction movement, exonerees, and those people doing work on behalf of those who were wrongfully convicted. And the group then engaged Andrew Hale to be the producer to create a film and a companion book. And the film became known as Murder in the Park, which is the subject of the defamation claims that are raised here, and the book that was written by William Crawford, the companion book as I would call it, is called Justice Perverted, How the Innocence Project of Northwestern University, Medill School of Journalism, Sent an Innocent Man to Prison. And this documentary and this book purported to tell the true story of how Plinkus and a colleague, Professor Protest, with the backing of Northwestern, engaged in a litany of criminal conduct, unethical conduct, for the purpose of framing an innocent man, Alstreet Simon, and securing the release of a killer, Anthony Porter, all because they wanted to end the death penalty here in Illinois. It is a sexy and fallacious story, but it is factually untrue. Now, the book and the film and its participants tell a patently false story about Plinkus Cialino's involvement in securing the confession of Mr. Simon. It falsely claims that Mr. Cialino strung on his way into Mr. Simon's apartment at gunpoint. It says that he misrepresented himself as a police officer. It alleges that there are promises made of riches and fame, and you'll get out in three years if you confess. There were promises that you would get the death penalty if you did not confess. There are allegations in the film that Mr. Cialino... Can I get one minute of your time? Sure. You're probably going to run out of time if you don't get on. Yeah, I'm going to keep you here in time. Okay, that's fine. I'll be happy to move on. At least seven times, because everybody talked about it. Very good, no problem. I'll be happy to move on. As the court well knows then, there was a lawsuit filed, and Mr. Cialino filed a counter-complaint on April 27th, 2016. And on April 27th, 2016, I think the parties all agree that that is in fact the filing date and the purposes of determining the statute of limitations. The parties seem to also be familiar with the Illinois Savings Statute, even if the circuit court overlooked it. The highly contested issue before the court is the date of approval for the murder in the park claims, and the Illinois Supreme Court has sanctioned application of the discovery rule in defamation cases, which required this court to ask them if Mr. Cialino had enough information in order to inquire about the defamatory nature or the content of this documentary to determine whether he had actionable claims. This is a highly fact-intensive inquiry, and it is our position that it is more appropriately addressed to a jury. Now, certainly statute of limitations arguments can be cut and dry. They are often cut and dry. They are not cut and dry in this case. Now, there can be no dispute that the last possible date that the murder in the park claims accrued was when it aired on Showtime in February of 2016. Not just because it was published in a way where it reached its maximum audience, but because it was the first time that Mr. Cialino had the ability to actually access the documentary and watch the documentary. Now, the showing in New York, the showing in Cleveland, the showing in Chicago, were those all private? So, the showing, they were not private in the sense that anyone was prohibited as far as I know. I'm not aware that they were an invited guest. The question is, was there any way for Mr. Cialino to know about a screening at a little-known movie theater in New York City, an obscure film festival? Now, I know the defendant suggested it was the largest film festival. It may be large in some sense of the word, but it was not popular. It was not the Tribeca Film Festival or the Sundance Film Festival or anything that most of us know about. It was a film festival that was not advertised. And the point is, the problem with setting the approval date prior to its mass production is that Mr. Cialino, even if he had found out that there was some film being out there about this, he had no ability to access it. Why? Because the defendants were only screening it to private audiences in a very limited fashion. Why? Because they wanted to sell it. They wanted to sell it to Showtime. If they put it out into the mass public, it would reduce its value. And distributors like Showtime would have no interest in it. Yeah, but the record contains an article. This is at record pages 1072 and 1073. It was published November 14 to 2014. And it quotes Mr. Cialino, provided a statement to them to create this article, as part of this article. So, he provided a statement prior to November 14, 2014. A statement about the movie? Yes. And this ends up, this article says his case will be subject of a film, Murder in the Park, which premieres in New York next week. Now, that does not mean that he read this article, right? I mean, but when you say how could he know, well, that would be a way. So, here is the issue. First of all, we also remember there was a flurry of activity going on at this time. Alfred Simon had just been released from prison. There was media outlets seeking comments from Mr. Cialino over and over again. I'm sure he did comment to a number of news outlets. That may be one of them. I'm not sure he read it or not. The fact that there was a movie being made about the Alfred Simon, Anthony Porter's father is not, in and of itself, going to put someone on notice that its contents were defamatory. It is possible, for example, to have made a film about this issue without including defamatory statements. This is what this is about. It talks about Mr. Echol, Mr. Echol, according to this article, you know, no one ever won the challenge, Cialino, he told Fox News, and Anthony Porter, you know, this was making allegations against Mr. Cialino. Of course, Mr. Cialino was not in the dark that people had made allegations. There were post-conviction proceedings. That part is not secret. Mr. Cialino was at least aware that Mr. Simon's attorneys had some theory that he had somehow done something improper during the taking of his possession. Is it correct that when he was prosecuted in November of 2014, he was actually responding to the Anita Alvarez interview and not making sure it was a film? Yes, exactly, and that's where I was sort of getting at, that there was a lot of activity and that there were... He clearly knew about Anita Alvarez. He knew that Anita Alvarez had exonerated him and had been critical of my selection. This is true. I don't think that we can debate that point. Whether or not... The defamation in and of itself is a very technical claim. You can be critical of someone in a general way without committing an act of... But your argument is that in November of 2014, he did not know that he had been defamed in the documentary. No, how could he? He would not have known... It hadn't aired anywhere. The fact that there was a documentary doesn't necessarily push him on notice that there are actionable claims in it. Yeah, but the standard isn't that he knew, right? Because the second half of it is that he should have known. And, you know, when you get these kind of allegations against you, wouldn't you follow up? I mean, you know, because that's the standard. If he had known that there was going to be a documentary in New York that was premiering that contained factually defamatory material, I'm sure he would have gone... Maybe he would have gone and tried to find out. But I don't think that the fact that there was just a film in the making about this tells us anything about whether there were actionable claims. There could have been any kind of thumbnail about the Austrian Simon. It could have even been critical of Mr. Fiorina without it being defamatory. And the fact that... Well, isn't there a fact question as to whether or not the film festival is that... He just certainly asked the question. He didn't actually answer it shortly. Whether or not that was a private event. I don't have reason to believe it was a private event. I can't represent that it was a private event. What I can say... It was not only for filmmakers and their crew. No, no. I don't believe it was. I think there was an audience there and I'm sure there was a general audience that was present. But the point is, to go to New York City to watch it, he would have had to have known that it was airing, the date, the location. And there isn't anything in the record that tells us definitively that rebuts his statement that I did not know it was filming in New York at that time. And that's uncertain. Even if he had known that it was actually airing, though, could he have known of its defamatory context? And what is important is that once it aired, he had no ability to see it. Once it screened... So in that sense, it was like the Tom Alexa case, where it was distributed to a small audience for a moment, for two hours or whatever it was. And then he had no ability to access it in order to determine its content because it wasn't published in any broad way. Let me ask you a question. What's the status of this case as far as discovery? Is discovery completed? In this case? Yes. There's been no discovery in this case. Okay. No discovery. Have all the defendants filed an answer? They filed motions to dismiss, so no. Okay. So we're not even at the discovery stage. We're not even at a point where an answer has been filed with respect to the underlying claim. That's correct. So the sole issue is whether this case was filed within a year of April 2015. Right? In other words, the defamatory act had to have occurred within one year of your April 2016 filing. Correct? The filing had to be within a year of the defamatory act. Correct. Okay. So there's plenty of discovery that has to be done. Absolutely. Our position is... I'm just asking. Yes. Yes, Judge. We believe it is a fact-intensive question and there is a great deal of discovery. We're sitting here talking about affirmative matters, that all these affirmative matters that they put into the record have... So you would agree that if we saw it your way on any of these defendants, that they should be allowed after discovery to refile a motion to dismiss on the basis of a statute of limitations violation, if they can develop the facts. I believe that they would be at liberty to do so. I would still argue probably that it should go to a jury, that they would have the right to do that. Right. So if we saw it your way, they would not be prejudiced in raising this statute of limitations issue again if they could develop a factually, legally sufficient motion to dismiss on the statute of limitations. That's right, Your Honor. Thank you. Your time is pretty much up, but let me ask you. Under Blair, the publication needs to be hidden, inherently undiscoverable, or inherently unknown. How would that apply here? It would. He had no ability to access it. He may have heard about it in New York. He didn't know about it. Unless he was sitting in New York City and had received some type of notification of the location, the place, and there. Was it hidden? Are you saying it was hidden? It was hidden to the extent that if he did not know about it, he would have no ability to access it. Well, that's a circuitous argument, though. But, I mean, is it? I don't believe that the standard is they have to be, for the discovery rules to apply, that it has to be overtly, purposely, maliciously concealed. It was hidden. It was hidden. Inherently undiscoverable, or inherently unknowable. It wasn't inherently undiscoverable if he didn't happen to be in New York and be sitting there. He had no way to access it. Just a second, because this is not a film that opens across the nation and that everybody could go and see it. It was shown in the film festival. It was no longer accessible. That's the argument of the theater. Yes, exactly. Because if he did not get a chance to see it at the initial premiere, there was no other opportunity to see it, or to even know that he had seen the film. That's right. And we would even agree that in Chicago, maybe when it screened in Chicago, he could have known, he had a better chance of knowing about it. So, it's possible that that is the trigger. It could be. And if it is, it is within the statute of limitations. And I don't know what my time is left. Well, no, you're out of time. You have 15 minutes left. Thank you. Good afternoon, your honors. My name is Steve Mandel, and I represent Andrew Hale and Whole Truth Films, the creators of the documentary Murder in the Park. I was able to negotiate more time. I don't know if I can add to my time at this point. Do it. Yes. We'll let you subdirect. Okay, thank you. I'll probably take as much time trying to get more time. Well, you should get to the point. Sure, sure. So, we don't need to belabor the underlying facts. Yes. I should point out that I'm also making common arguments for attorneys Sotos, Echol, Officer Delorto, and Bystory Simon. I'm not making arguments for Pride Crawford or Ms. Alvarez. Let's get to the point. Counsel devotes her argument to whether or not he knew or should have known about Murder in the Park when it first screened in New York in November of 2014 at Doc NYC. First of all, the record is uncontroverted. One of the filmmakers submitted an affidavit. Doc NYC is the largest documentary film festival in the country. Wouldn't there be a fact question whether, even if it's the largest in the universe, that it wouldn't raise to the level of he knew or should have known? No, let me tell you why.  The Tom Oleska case. There had never been the discovery rule applied to any defamation case until the Tom Oleska case, right? That case created a narrow exception that involves a credit report, a confidential credit report, for communications that were inherently unknowable, right? That's not the situation here. It's not hidden. It's not unknowable. Why would Mr. Cialino or any of us or anybody in this courtroom know the contents of a film in New York at a doc festival? Because it was promoted. It was covered in local and national news articles, traditional media. It was covered on the internet. It was promoted. It was reviewed by critics. It's the fact of the film, not the contents of the film. The fact of the film, but keep in mind, on October 30th, 2014, State Attorney Alvarez held a public press conference condemning the conduct of the plaintiffs. You're talking about your clients with respect to the film, correct? That's a defamatory act that you're saying occurred in 2014, and therefore the filing of this defamation suit occurred more than a year later, right? Isn't that your argument? That's my argument, that the film, which covers, which addresses murder in the park, including the outcome, which was that Anita Alvarez exonerated, and a judge, the chief judge of the criminal court, exonerated Alcery Simons based upon the plaintiff's conduct, right? So the plaintiff, so you have a film that is... But how would anybody know it was about the defendant's, or the plaintiff's conduct? That's the point. How would somebody in Chicago, the reasonable man in Chicago, know the content of a film in New York, and the contents of it, and whether anything in there was defamatory? How would one be charged with knowing it, or should know it? Well, respectfully, Your Honor, you're focusing on whether someone knew or should have known, when the fact of the matter is that the test is whether or not it was hidden and concealed. And Mr. Sciolino could have gone to New York, he could have gone to Cleveland, which, by the way, aired two sold-out performances through the whole weekend, right? You can't put your head in the ground, right? But that's the knowledge standard. The question is whether it's known, and does he have to... I mean, it's out there, it's a defamatory communication. If I'm in Alaska on a fishing trip with my colleagues, and I make a defamatory statement about you, and three years later you happen to run into my colleagues, and they tell you what I said three years earlier, do you then, at that point, have a defamation cause of action against me for something that was said in public in Alaska three years earlier? No, Your Honor, if it's said in public, for example, let's say something appears in the Chicago Tribune, okay? But I don't get the Tribune, right? It's in Chicago, it's about me. Can I say, well, I didn't know about it, and I don't read the Tribune. Or let's say it was in Milwaukee. Oh, sorry, Simon lived in Milwaukee. Well, it's in the Milwaukee Journal Sentinel. Well, I didn't read that. Couldn't a jury then sit there and decide whether he should have known about it? Even though he says he didn't, should he have? Again, Your Honor, respectfully, you're asking whether he knew or should have known, where the test is whether or not it's hidden, and defamation is a different animal. The statute of limitations are short because defamation claims collide with First Amendment interests. What constitutes hidden? What constitutes hidden? Well, I think some of the cases explore that. It's whether or not it's unknowable because it wasn't available to anybody in the public, right? Like the credit report, that was sent only to subscribers. Private communication? Yeah, but when I think of hidden, I think of hiding something. But that was sent to thousands of people, the credit stuff, or however many may have needed it, right? I mean, it wasn't hidden, it was just not available. It wasn't available to the public, whereas these two film festivals, anybody could walk off the street and buy a ticket. If he was concerned about what was in there, as he ought to have been, because the basis for Simon's exoneration was his conduct, he could have asked to see a copy of the film. He could have ordered a copy. He could have called the filmmakers, right? But again, that's his obligation of knowing or whether he should have known. The real test here is whether or not it was hidden. And those instances, and there's really only been one to my knowledge, other courts that have addressed the issue have said this is not hidden. Oh, let me give you an example, okay? The Schweitz case, the Seventh Circuit case, and there was just a recent Illinois unpublished opinion that did the same thing. You have a prisoner, an incarcerated prisoner, who's the subject of a defamatory statement, right? He doesn't have access to the Internet. He can't get it. He sues, and the case gets dismissed on special implications grounds. The court says it's not whether or not he knew or should have known. It's whether or not it was hidden. And even though the prisoner didn't have access, couldn't have gotten the publication had he wanted to, it was still, the dismissal was upheld on appeal. Now, I know that we're focusing on, by the way, one more thing on that point. There was a Chicago Sun-Times article that appeared on October 30th, the date that Ms. Alvarez made her announcement, right, which reported on not only the exoneration of Alstor Simon, and by the way, this is at 1061 in the record. October 30th was 14th? Correct. Okay. And it's in the record 1061. It reported on the exoneration of Alstor Simon, the fact that he was picked up by the filmmaker who had produced a documentary about the case called Murder in the Park. It talked about plaintiff's grand jury testimony, wherein he admitted deceiving Simon into taking his confession, and a quote from the plaintiff that he stood by his conduct, right? So this had to be apparent to him at this time. See, now you're making inferences. This is a 2619. Correct. And inferences drawn have to be drawn in the plaintiff's favor. So when you say it's apparent to him, that's not drawing an inference in his favor. That's drawing an inference against him. And that's where we get back to the fact question. Well, Your Honor, again, I guess I'm arguing against myself by talking about what he knew or should have known, right, because the question is whether or not it was hidden. The point is he had to draw the time on purpose. Right. But if you adopt this test, right, which is a subjective test, what he knew or did know in a defamation case, you're opening up a real can of worms that's a slippery slope, because you're never going to have a plaintiff, a defamation plaintiff, who's going to admit to what he knew or should have known. Again, my Milwaukee Journal Sentinel situation, like how far is too far? What if the article was in DuPage County, right? I mean, that's just not the way that the courts have addressed defamation statute of limitations periods applicable to defamation claims. Now, the court can affirm on any basis apparent from the record. The issue, though, was not necessarily whether or not the information was hidden. The issue was whether or not it was widely available. I mean, if you were talking here about the New York Film Festival, where the invitees are filmmakers and those related there, too, it's generally not something that the public attends. I agree with you that you can buy a ticket and walk into the Chicago Film Festival at any time. But generally, those people who are not affiliated with the film festival are not given an invitation to come. So it's possible, as the other justices have stated, that Mr. Steven Filino had no idea what was going on out in New York. And that's why it may still be, or may, or may not, they need to be resolved later in the case after this thing is over. Do you want to respond? Yes, Your Honor. I mean, again, the question is not whether some people go or some people don't go. I mean, I think the evidence in the record is, and it wasn't contested by plaintiff on appeal, is that anybody can buy a ticket and attend these film festivals. But I think the point is, again, there's a very narrow exception. If you read the appeal decision out of the first district, this district, you'll see that it's very narrow. Was the publication hidden or concealed? And I don't think there's any way that you can say under this record, with not only the two film festivals, but the wide discussion of the film on the Internet in national and local publications, that it was hidden. And, in fact, those critics and the discussion of the film talk about the angle of the film. One is even critical that it didn't give more of the wrongful conviction perspective because they didn't participate. So the thing that I wanted to raise is that the court can affirm on any ground appearing in the record, and there was a host of First Amendment grounds, including the court. Let me, before you, I know you want to get on to those other things. Yes, sure. But I just want to, in Olesker, it talks about weighing and that there, if there's a claim of any want of diligence on the part of the plaintiff, and I'm going to ask you, do you have a position on that? Or is there anything to suggest any increased problems of proof, so far as the defendants are concerned? It's based on, you know, the length of time and the discovery rule. Is there, are you saying that the plaintiff was not diligent and that there was an increase in problems of proof? Yes, let me talk about that briefly. First of all, if you watch the film, you know that like how many witnesses have died who were unable to talk about, so the passage of time dims memories, people pass away. But one of the interests involved in the short stretch limitations is to give a publisher an opportunity to correct any misstatements while the harm is fresh, okay? And so you've got a lack of diligence by a person who claims to be like an internationally famous investigator, right? But apparently he's got his head in the ground, even though you've got the state's attorney condemning his conduct, okay? So there's clearly a lack of diligence, and the delay runs counter to the interest that the short stretch limitations on a defamation claim is designed to protect. So there's both delay and prejudice, both in terms of frustrating first amendment protections as well as, well, I lost my trance out there. So I'd like to shift to the first amendment grounds here. You know, usually if you read a bunch of, you can read a hundred opinions, defamation opinions, and they talk about is it defamatory per se, is it subject to innocent construction, is it protected by opinion, or is there a privilege applied? Rather than go through 30 statements like we have in our briefs, I think there are two basic principles that call for the assurance of this case. And one is the opinion doctrine, right? Because this is a classic situation where you've got, and counsel alluded to it, right? Political agenda, right? Before you get into that, really, it's to your benefit, I think, but that's not why the case was dismissed. True. Right. True. And if we agreed with your notion that you're getting into about the privilege, now we're getting into the facts, right? And this case wasn't dismissed on the facts or the merits. Respectfully, Your Honor, the question of whether or not the documentary film is opinion or protected by the fair report privilege is a question of law that the court can decide. But did the lower court decide that? The lower court didn't. But, again, the appellate court's job is to see whether the result was proper, not the reasoning. And so I respectfully submit that if this case is dismissible because as the movie, I mean, if you watch the movie, you see a quote. But are we supposed to watch the movie and try to figure out a way of confirming the circuit court? I mean, that's the difficulty with that argument, as far as I'm concerned. It was a 2619. What happened was it was a little bit backwards, right? Because ordinarily, if you file a defamation case, you attach the allegedly defamatory material to your complaint. The plaintiff refused to do that. So we came in. If it's based upon in federal court, you'd say, well, it's based upon this. You submit the thing and you argue for it, right? That was our affirmative matter, was the actual movie which the complaint was based on. And so I think the court can look to that as if it could a news article, a book, whatever, and say, okay. You would agree that we in the state court look at things differently than the Southern Circuit does and dismissals of complaints, correct? Correct. But I think there are cases that support the notion that if on a 2619, whether it be a newspaper article, a book, a movie, whatever, if I submit it to the court, the court makes a legal determination initially as a gatekeeper. Is this per se defamatory? Is it subject to innocent construction? Is it protected opinion or is it protected by the fair report privilege? So I think that's well within the realm of what appellate courts do. The plaintiff would get to throw in their two cents also, right? She has in her briefs. So, I mean, look, in terms of opinion, you've got people who are attorneys, advocates, police officers, and people who want to get out of jail who are saying, here are the facts, right? And the facts are court proceedings, right? And from this, I conclude that Al Story Simon was framed. I mean, that's classic opinion. If you look at Owen V. Carr, which involved an attorney presenting his client's case, the Supreme Court said that's opinion. If you look at Brennan V. Kanner, which says when you've got a hot debate going on where people, viewers, are anticipating that the parties are going to try and persuade them to their point of view, that's opinion. And so I think this is clearly a protected opinion. But when you start saying that witnesses were paid off, that's not an opinion. Either they were or they were not. That's a fact issue. Actually, if you look at the cases, right, if it's clear, for example, Al Story Simon gives his position on why he thinks he was framed, right? Everybody knows that he's doing that because that's his position. That's what his lawyer said, right? That's that classic situation that was addressed in Brennan that says, you know, things that ordinarily would be fact statements are deemed to be opinion because of the context in which they're said. And this is like a debate over, you know, there's never going to be an answer as to who committed these murders, right, what the outcome was, but you are going to have the debate over what occurred. We started with the Partington v. Bugliosa case, which is almost the same thing. I think it's much simpler than that. I think that it's what we learned in kindergarten was a fact statement is an opinion. You say someone's ugly, that's your opinion. If you say someone gave me money, that's not an opinion. They either gave you money or they didn't. And I think it's really just that simple. Respectfully, Judge, if you call someone a thief, okay, that may not have been convicted of being a thief, then that may not be a problem. If you say I saw someone go into the supply closet and steal pencils, he's a thief, that's fact. If you say that guy's a thief, that's name-calling hyperbole of opinion. That's exactly what we're talking about here, so now you get my point. Well, I think the context here establishes that if you look at the context of the film and what's going on. Regardless of that, some of the statements were fact and some of the statements were opinion or whether or not they were false facts or something else. But there were statements that were made that were factual statements. That's the concept. And that needs to be determined. That's why that needs to be determined later. We're not making that determination. But I think the facts in the record are facts of which this Court can take judicial notice. They're depositions. They're grand jury transcripts, right? And those are the facts that the filmmakers relied on in voicing their opinions. Now, when you started, you said could you have more time. Was somebody else giving out their time or was that just... That's the question. Yeah, I frankly don't... I started with 17 minutes. I think I wound up after negotiations of perhaps 21 minutes. But if I could just maybe address the fair report privilege then. Okay, quickly, because you're at 22 minutes. Oh, okay. I'm sorry. So the fair report privilege obviously protects the media and entitles the media to report on official proceedings, court proceedings, or the actions of elected officials like what Ms. Alvarez, her press conference, right? And there's only two requirements. One, it's an official proceeding. And two, the report is a fair abridgment, right? And to figure out whether it's a fair summary of the underlying proceedings, you have to compare the just in sting of the report, i.e. the film, with the just in sting of the underlying proceedings. And as I said, there's no question that the plainest claim can't survive under that test because if you look at what Ms. Alvarez said, she said that had it not been for the statute of limitations expiring, she would have... You are arguing for the fact that you started off by telling them that. Pardon me? You started off by telling them that you were not here on behalf of Ms. Alvarez. I'm not. This is an argument for the filmmakers because they are getting a fair report of what happened in court and at Ms. Alvarez's press conference. And the point is that Ms. Alvarez condemned his conduct as criminal, said he barged into Simon's apartment, impersonating an officer, brandishing a gun, and so that's very negative stuff. And there's nothing in the film that is more negative than that. So the film, which shows what happened in the court proceedings and at Ms. Alvarez's press conference, is privileged under the fair report privilege. Thank you. All right. Thank you, Your Honor. Your Honor, you may close the court. My name is Michael Beasis, and I have the honor to represent Jim Sotos today. Jeremy Bader, who filed the brief on Terry Echol's behalf, and I have conferred and we're coordinating the argument that I will be making on behalf of both Sotos and Echol. I have three minutes. We have joined the arguments made by Hale and Whole Truth Films. I want to talk about the argument that is not relating to the statute of limitations. Even assuming that the claims are not time-barred, the trial court can be affirmed because the statements made by Sotos and Echol were reasonably capable of an innocent construction under Owen v. Carr. I heard from a suggestion today that while certain issues may raise questions of fact, in the first instance, innocent construction is a question of law, Owen v. Carr, 113 Illinois 2nd at 279. That is a second basis for dismissal under section 2-619. It was fully briefed. Everybody had the opportunity to address that argument, and as Mr. Mando has already pointed out to you, you can affirm the dismissal under 2-619 on any grounds supported by the record. In applying the innocent construction rule, the court considers statements in context and as a whole. Statements are not actionable. If the rules express a subjective view or offer an interpretation, a theory, conjecture, or theories, statements should be given a non-defamatory meaning, if at all possible. That is Blackwater law. Now, the statements from Sotos and Echol made on camera, reasonably construed in the context of a 90-minute movie, were not defamatory for the same reason that the statements were not defamatory of Owen v. Carr. The reads of the movie, if you will, would understand that Sotos and Echol were speaking as felons' attorneys, advocating for the client's innocence and release from prison. Saying the same thing about what plaintiffs did to get someone to confess, the trickery, the threats, the false promises, and plaintiffs' role in the hiring of a private attorney who did not question the confession, went to the heart of the offense and the other field of the events surrounding the confession. As such, those statements were subject to an innocent construction and constitutionally protected. The viewer would understand that the attorney would be representing and presenting the client's view of the events surrounding the confession. Not that they were making an unbiased, neutral, detached presentation of the facts. Judges are neutral and detached. Lawyers are advocates. Just as the plaintiff is an advocate today, just as we are advocates on our side of the case. If the rule were otherwise, no attorney could undertake on a controversial case without risking liability for repeating theories and defenses about the case outside the courtroom. Sotos and Echol did their jobs as advocates for their clients in the courtroom and in the court of public opinion. Their efforts were in the best position of the defense bar in representing their clients. Their on-camera statements attacking the confession on their client's behalf were not actionable under Owen versus Carr, regardless of plaintiff's theory of recovery. If there are no questions, we stand on our arguments and our briefs. The trial court's dismissal of counts 1, 4, 5, and 6 on behalf of Sotos and Echol should be affirmed. If I have any time to yield, I yield it. Thank you. Thanks very much. Your Honor, I yield my time to Mr. Mandel. I do represent A.L. Story Simon. If the court has any questions, I would be happy to answer them. And I would also like to say that I adopt counsel's argument regarding Owen v. Carr and innocent construction with respect to Mr. Simon. One of the post-condition petitions he filed was pro se, and so he was stating his own advocacy of his positions. Thank you. Thanks very much. Good afternoon, Your Honor. Harry Holmes for William Crawford. The arguments that have been advanced apply for Mr. Crawford as well. The accrual date in our case is a little different than the publication date that everyone does agree to of June 9, 2015, when Justice Perverted was published. We have an accrual date that's different. We go back to 2011. We published online in the Internet a manuscript called Shemera. We believe that this is our date. It's not a credit. It's Shemera and the other, let me just see, the Justice Perverted. Are they identical? They're not identical. One is in a book form that's published by a publisher. The other one is in a manuscript that's approximately 110 pages long that contains virtually the same allegations, much of it is paraphrased. I mean, I cannot tell the court that each and every quote is exactly drawn from Shemera, but Shemera was a 110-page online publication that Justice Perverted essentially tracked, and some of it is verbatim quoted out. The key for Shemera is it is not hidden or undiscoverable. It's not inherently unknowable. In fact, it's pled in plaintiff's complaint in paragraphs 103 to 107 that Mr. Sciolino and POTUS and Northwestern knew all about this Shemera article, and they used some derogatory language to discuss Mr. Crawford, but that only goes to prove that they knew all about it. Well, let me ask you something. Justice Perverted is the basis for the current defamation claim, correct? That is correct. So the allegations are drawn, the specific claims are drawn from Justice Perverted. Right. So that's the document that we would look to to see whether the statements were defamatory. Whether they derived from reading Lucy's wouldn't matter, right? Correct, but the fact of the matter is all of those alleged defamatory comments were paraphrased or directly drawn from the Shemera manuscript that was put forth in 2011. Perhaps not direct quotations in every one of them, but it's our position, and the Shemera is a record in the case, so it's our position that the accrual date for Mr. Crawford goes back to spring of 2011. We join with the other lawyers who have put forth arguments on the issue of business and construction and that these allegations with regard to Mr. Crawford are not defamatory. But with that, I think that's all I have to say to the audience. Do you believe that Justice Perverted was simply a republication of Shemera, correct? Is that your argument? We're always defining publication, yes. I mean, I think that's the case. So isn't that a fact question as to whether or not there is anything new in Justice Perverted versus what was previously published in Shemera? That is a fact question, correct? Because not— Who's going to determine whether or not there's no new defamatory statement in Justice Perverted, that all those statements were previously published in Shemera? Right. I mean, I— That's a fact question. Well, I don't think it is. I think that we—I mean, I'm not trying to put the burden on you or your clerks. I mean, I think that the Shemera and the Justice Perverted are both a record in the case, and these should be gleaned from each of them to determine what is new. Hey, this is a totally new thing you said here. But the fact— But Justice Perverted doesn't defy that question. Well, I think that when we're talking about whether something is defamatory in 215 but it had previously been said in 2011, the fact of the matter is it's really the same things that are said. They're not— And who exactly— Who is the judge? So those themselves, I think, speak for themselves, Your Honor. I mean, I'm not—I mean, so the judges of the Court of Circuit County of Cook County, which Judge Lawler determined that, and I think that that should be affirmed. This was before the judge at the time. But he didn't rule on it. I think he did. In the motion to dismiss, he specifically said that, in the court order, he said that Crawford's motion to dismiss was granted, and he specifically referenced the accrual date of 2011. But doesn't that refer to a limitations dismissal as opposed to a content dismissal? He did do a limitations dismissal. Correct. But he goes back to the accrual date of 2011 in his court order. Okay. That's your argument. Thank you. Thank you. Good afternoon, Justices. My name is James Thompson. I'm here on behalf of Defendant Martin Creed, and I'm going to try to speak as quickly as I can. In the event that this court finds that the savings clause is affable, Defendant Creed is in a little bit of a different position because Justice Lawler issues a more specific opinion beyond statute of limitations as it relates to Martin Creed. Judge Lawler says, in any event, Creed's statements were based on court findings, and even if Creed's negative statements were offensive, rude, et cetera, Creed's statements thus do not rise to the required level of extreme and outrageous conduct. And I think at the very least that's a signal to this court, and I hope the court takes it upon themselves to look at the full record in this matter and make determinations with respect to whether something is an opinion, whether something is a fact, based upon the law. And I would remind the court, on behalf of Martin Creed, he has a personal blog, and that personal blog is entitled Crooked City. It's a signal to anybody that's going to go on to that blog and read that this is an opinion of Martin Creed, and it's an opinion on matters that are a hot debate, that are significant, that impact all of us. And at the end of the day, Martin Creed is providing his opinions based upon the record, based upon statements made by Chief Attorney Alvarez, and based upon the public acknowledgment by the plaintiff in this case about his unethical conduct and that simply he can do whatever he wants regardless of the impact on the criminal justice system. And probably most important, justices, at the end of the day, we are stopped with two victims who will never receive justice, those two individuals that were slain in the case of Anthony Porter and Paul Story Simon. And Martin Creed is providing his opinion relative to the situation and the outcome and how Paul Solito's conduct that he takes pride in, even if it's outrageous, how that has impacted the criminal justice system, defeated its purpose, and provided these victims with no justice. And those are opinions of Martin Creed, and he's simply inviting the general public to opine on those opinions and impart some of the facts contained in the judicial record. So I fully support the sole desire to make these decisions based upon the record before you and the arguments presented in our brief, and I certainly join with the other defendants in this case relative to these issues. Thank you. Thanks. Good afternoon, Justices. My name is Eileen Rosen, R-O-S-E-N, and I represent former Cook County State's Attorney Anita Alvarez. And I have, I believe, three minutes to address complaints I want to make quickly. With respect to former Cook County State's Attorney Anita Alvarez, the accrual date is different. The defamatory statements arise from, the alleged defamatory statements arise from the press conference that she held on October 30, 2014. It was widely publicized, it was printed in the newspaper, and it was televised. And those allegedly defamatory statements were then repeated through the documentary. They argue that the record doesn't show that it was televised. Well, it doesn't matter whether it was televised or not. It was published for sure in the Chicago Tribune, and we cite to that article in our brief. Was it before the circuit court? Has it been in the record? Yes, it was in the record. And the statements that were made, that are quoted in the Tribune, are that Mr. Cialino's tactics were coercive and unacceptable by law enforcement standards. Ms. Alvarez is quoted as calling the investigation conducted by protests and Cialino's self-blasphemy that it's clear the constitutional rights of Mr. Simon were not scrupulously protected as our law requires. The Tribune went on to note that Ms. Cook County State's Attorney Alvarez considered bringing obstruction of justice charges or witness intimidation charges had the statute of limitations not run out. Those are the very same defamatory statements that appear again, the alleged defamatory statements that appear again in the documentary. So the statute of limitations accrued on October 30, 2014, to avoid the result that the civil cause doesn't even come into play in this case. The Tribune tried to lump in Ms. Alvarez with the murder in the park defendants. However, that attempt fails because there's no dispute that the alleged defamatory statements were published October 30, 2014. And that suffices for mass publication and eliminates this discovery rule whatsoever on behalf of Ms. Alvarez. In an effort to avoid that, there's an additional intentional affliction of emotional distress claims and civil conspiracy claims, but they're based exactly on the same allegations, and so you can't avoid them when you're statute by pleading derivative claims. And then finally, Ms. Alvarez also has absolute immunity. All of the statements she made were made in connection with her official responsibilities as the sworn Cook County State Attorney, and they were made at the time that she announced the decision that she had come to with respect to seeking a filing motion with the Circuit Court of Cook County seeking dismissal of the charges of Mr. Simon, and that motion was granted by Judge Beeble. And so all of her statements would be protected by immunity in addition to the fact that all the claims are time barred. When was the ruling by Judge Beeble in relation to the press conference? The same day. Same day? Yeah, same day. So you're reading of this whole transaction. Nothing happened after the press conference with respect to Anita Alvarez except for the publication of the documentary. That is correct. So the documentary simply showed excerpts of the televised press conference, but it was a repeat. She was not interviewed. She did not speak again. It was just a repeat of the comments that she made on October 30th, 2014. If there are no other questions. Thank you. Back to the statute of limitations issue. My colleague here made the analogy between I don't get the Chicago Tribune. There's a statement in there that's not in dispute. Yeah, but probably everybody you know does get the Chicago Tribune. Somebody might say, you know, hey, there's something about you in the Chicago Tribune, and you can go out and get the Chicago Tribune. It's accessible. And that's what makes this different, that there was no ability on the part of Mr. Cillian to go watch the documentary after it aired in New York. Same thing with the prisoner. He doesn't have access online. But I'm sure his mother or maybe his sister or a family member, he can say, hey, what does it say? Print out a copy for me. Send it to me. It's accessible. It's there. It's accessible. And that I think is the difference between hidden and accessible, and I think that's one way we can look at it. Mr. Cillian, again, had no ability to go and he couldn't get online. He couldn't order the film. He couldn't do anything once it aired in New York. What about the argument that he was a pretty good investigator? I think he could do it if he really were a pretty good investigator. And his own comments that he was. To find something that's proprietary and in the possession of the filmmakers, I can assure you, they wanted to make money on that. Nobody was getting their hands on that. That was being sold to Showtime, and they were screening it in private spots in obscure places so that they could generate some interest. In New York, in Cleveland, obscure? There's 20 film festivals going on in New York City as you see. I think in my reply brief, I think there are like 3,000 film festivals that go on. This is something that's done in the industry, and why? Because people who buy films go to these things, and they watch them, and they say, oh, I want to buy that and mass-publish it so that I can make money off of it. That's what the purpose of these film festivals are, and that's what happened. This isn't for Paul Fiolino, who lives here in Chicago. And again, Your Honors, they keep talking about how wisely published it was, but if you look at the actual record, it just doesn't bear this out. We have a couple of tweets from some unknown guys and some references to a film being made among a bunch of articles that were really more preoccupied with the fact that Alfred Simon was being released from prison. So I think it's very different. I don't think the analogy was made. I think it is like Alexa. It's not that Alexa was hidden. It was just distributed to a group of people, subscribers, and it wasn't widely available or accessible, and that is the distinction and why this falls neatly into the category of Alexa. Also on Alexa, Alexa also says, special limitation isn't meant to protect wrongdoers. It is meant to encourage diligence, and we have diligence here. Mr. Fiolino, two months after it came on Showtime, this is really when he suffered the greatest amount of injury, if we're going to be honest here, is when it hit the national mass publication. Two months after that, he filed his counter complaint, and he filed it while the federal litigation was going on, so they can't possibly claim that there was any prejudice to them or that their proofs were. They were litigating these factual issues, maybe in a different context. What about State's Attorney Alvarez's position that what was in the film was really a replay of her press conference from October 2014? Correct, and that is true, Your Honor. We can see that. So, it's her statements that day. Why isn't she afforded the one-year statute of limitations? She's a closer call to everybody, and we will concede that. We do contend that the press conference was not televised. They provided no proof that it was televised. It is a factual issue, and we believe that, yes, it was published in the Chicago Trib, that she had made statements, but I do agree with Your Honor that it is a closer call with her because her statements that were made at the press conference were actually published in the Chicago Tribute in some general sense. But, there is no evidence in this record that it was ever televised, or that Mr. Scalino had the ability to go look at that press conference. But I did respond to it in November of 2020. Yes, the general idea, and that's true. Well, as to David, he said that October of 2014, like other members of the public, I learned that Cook County State's Attorney, Anita Alvarez, had dismissed murder charges against Simon and released him from prison. I was generally aware through news articles that Alvarez was critical of Northwestern's involvement in the border exoneration, but never saw or read any reporting on Alvarez's statement specific to my conduct in the border investigation. So, but where is the diligence? Again, Your Honor, I don't know how he could have gotten in press conference if it wasn't actually televised. I will say this, he has always been up front, but he was generally aware of her criticism. I want to take this opportunity to correct something that my counsel said. It is absolutely, and truth does matter, and it matters here in this courtroom too. Ms. Alvarez never said anything in her press conference about Mr. Stiolino barging in. If you look at the statements that Ms. Alvarez said, my colleague said that she made very specific findings about his misconduct. That is just not true. We're not concerned about the content. Your date is October 2014. The question, with respect to Ms. Alvarez, was she sued within one year of that date? It appears not. If that's the date of accrual, and the discovery, it does not seem that the discovery rule should apply here, that would be true if the court doesn't apply it. And like I said from the beginning, she is- So focus on the issues of course. Okay. Now, I would like to also point out, Your Honor, that the civil court privilege is a fact issue. It is an extraordinarily important fact issue, and even in Bericat, it says it's an issue for the jury because you can abuse the fair report privilege very easily by framing things as fact rather than allegations, by adding to the post-conviction proceedings or the reports the facts that weren't there. For instance, Mr. Freeh says in his blog that there are allegations that Mr. Stiolino and Mr. Profess were using students to seduce people. You don't get more factual than that, and there's nothing in the post-conviction proceedings that supported that, and that is a clearly defamatory statement, and you don't get the haggard line in the First Amendment for making such an injurious statement, and so it is just not the case that the fair report privilege is a matter of law. Whether it applies? Sure, maybe it applies. But the question is, did they abuse it? And they did, and they did it in a number of ways, which I won't get into at this juncture because it's well briefed, but I think the court will see that, incredibly, a not-with-explanatory material was omitted from the movie. Ackerman-Soto. They don't get special privileges because they're attorneys when they come outside the courtroom and make factual statements, and I think there was some conflating of innocent instruction and fair report privilege in these arguments that were being made, but I want to point out, for instance, Terry Echol made comments about they go to poor people and they try to give them things of benefit so that they change their story. That may have an opinion in there, but it absolutely certainly has facts in there, too, and those are false facts, and that's why a jury needs to determine whether they were defamatory. So they don't get protections outside of the courtroom for making factual statements, and it is for a jury to determine whether or not, again, they're entitled to the fair report privilege or whether there is an innocent instruction. Two things. On Mr. Crawford, it's very simple. The defamation lawsuit was filed within the statute of limitations, easily within the statute of limitations. There's no doubt there. The only argument that they really advance is that chimera, some document that Franklin would not publish. They can sit here and say in this court that it was published, but they've not provided an affidavit saying it was published. They've provided no proof it was published. It was not published. They say it just was online somewhere. It's not showing that it was published, and it wasn't published. It only became available through the civil litigation, and even if it was published, it's not a re-publication, and that's what the single publication rule prohibits. So that does not save Mr. Crawford, And as for Mr. Preeb, I think I've addressed those statements, but you can look at Mr. Preeb's statements in his blog. They are factual in nature. They aren't just about my opinion about whether justice was done. So with that, I don't know if the court has any additional questions. Just real quickly, with regard to Mr. Crawford, a publication means telling somebody other than the plaintiff, right? That's a publication. I think, yes, telling another person. That's correct. So in the complaint, in paragraph 119, it says, In late 2011, Andy Hale joined the team to swift-boat Protus after reading Crawford's manifesto, Chimera. That's right. So obviously it was published to him. It was given to him when they were talking about making a film, and we only found out about this through the civil discovery because we got a copy of it at that point. There was actually a hearing there about this, on this exact issue, that this came up. And so it was given to Mr. Hale. I don't know how Mr. Hale got back to the fishing boat analogy in Alaska. There's no way Mr. Hale could have possibly known about this chimera when it was just shared to Mr. Hale. But, again, even if the court wanted to find out that it was published, it's not a republication, and it's very clear that the single publication rule discusses republication, not same concepts, same ideas. I said something sort of like that in the past, or it's kind of like this, or even it's really similar. It has to be an actual republication. Incidental to, it had to have been actually the exact words that Mr. Crawford laid out in Justice Perverted. That's what the single publication rule prohibits, and that's not what happened here. Okay, great. Thanks very much. We really appreciate it. We appreciate the briefs. We appreciate the argument. We'll be taking this under advisement. Thank you. Thank you.